**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 22, 2008

Charles R. Fulbruge III
Clerk

---

No. 07-50832

---

D.C. Docket No. 5:03-CV-305-*FB*

NOVA CONSULTING GROUP INC

                    Plaintiff - Appellee

                    v.

ENGINEERING CONSULTING SERVICES LTD

                    Defendant - Appellant

**FILED**

SEP 1 8 2008

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

     Appeal from the United States District Court for the
          Western District of Texas, San Antonio.

Before JONES, Chief Judge, and BARKSDALE and STEWART, Circuit
Judges.

                    J U D G M E N T

     This cause was considered on the record on appeal and was
argued by counsel.

     It is ordered and adjudged that the judgment of the District
Court is affirmed.

     IT IS FURTHER ORDERED that defendant-appellant pay to
plaintiff-appellee the costs on appeal to be taxed by the Clerk
of this Court.

ISSUED AS MANDATE:     SEP 1 5 2008

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _Rhonda Parker_
          Deputy

New Orleans, Louisiana          SEP 1 5 2008

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

# FILED

August 22, 2008

No. 07-50832

Charles R. Fulbruge III
Clerk

NOVA CONSULTING GROUP, INC.

Plaintiff-Appellee

v.

ENGINEERING CONSULTING SERVICES, LTD.

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:03-CV-305-FB

Before JONES, Chief Judge, and BARKSDALE and STEWART, Circuit Judges.
RHESA HAWKINS BARKSDALE, Circuit Judge:[*]

At trial, claims for misappropriation of trade secrets and tortious interference with contractual relations remained in this diversity action by Nova Consulting Group against Engineering Consulting Services (ECS).  A jury returned a verdict for Nova on both claims and awarded actual (past and future lost profits) and exemplary damages.  The district court reduced substantially the future-lost-profits award.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 07-50832

Nova does not appeal that reduction.  At issue for ECS' appeal are:  the admission of Nova's expert witness' testimony on damages; the sufficiency of the evidence for liability and damages; and two ECS-proposed jury instructions being refused.  AFFIRMED.

I.

Nova and ECS are competing, nationwide, environmental consulting firms. Their work involves, among other things, evaluating soil conditions for architects and engineers, as well as testing air quality, construction materials, and for asbestos.

Nova opened an office in San Antonio, Texas, in September 1998.  All its employees signed employment agreements, with prohibitions against ever disclosing confidential information, and, for one year after leaving Nova, against competing with Nova or soliciting its employees.

By 2001, Nova's San Antonio office had over $2 million in revenue.  That same year, ECS entered the San Antonio market.  Mike Harwood was hired to establish the ECS San Antonio office by hiring top talent from other firms. Harwood had not worked for Nova; but, he had worked with several of its employees.

From February through April 2002, ECS hired top managers, project managers, and key technicians away from Nova.  Included in this group were four former Nova managers: McIntosh, Burge, Hernandez, and Hunter. (Named in this action as individual defendants, they were voluntarily dismissed during trial.)

By 2002, revenues for ECS' San Antonio office were nearly $2.5 million; for 2003, $2.3 million.  During this same period, Nova's San Antonio-office revenue dropped to $1.5 million the first year; $578,000, the second.

In filing this Texas diversity action against ECS and the four former Nova managers, Nova alleged:  ECS ignored Nova confidentiality agreements, by

2

No. 07-50832

requiring the Nova employees hired away by ECS to load into its database client information taken from Nova; ECS allowed former Nova employees hired away by ECS to solicit employees still at Nova to also join ECS; ECS employees, who were former Nova employees, solicited and hired employees still at Nova; ECS' conduct damaged Nova through loss of client base and loss of key employees; and ECS intended to harm Nova, because evidence shows a plan to dominate the market by decreasing other firms' ability to compete.

ECS responded:  Nova employees moved to ECS because Nova was losing its place as a leader in the industry, not because of improper solicitation; the changing nature of the environmental consulting practice caused Nova revenues to drop because it did not adapt to changes as well as ECS; and there was no misappropriation of protected or confidential information by ECS because there is a reasonable explanation for everything alleged to have been taken.

Nova also alleged the four former Nova managers breached the following prohibitions in their employment agreements:  non-disclosure of confidential information, non-solicitation of Nova employees, and non-competition.  Prior to trial, the district court ruled by summary judgment that the covenants not to compete were overbroad and unenforceable.  On the other hand, the employment agreements' non-disclosure-of-confidential-information and non-solicitation-of-Nova-employee provisions remained in issue.  As noted, the four former Nova managers were voluntarily dismissed during trial.

Following four days of testimony, including by an expert witness on damages for each party, the jury was instructed, *inter alia*, to determine whether ECS unfairly competed with Nova by misappropriating trade secrets, or tortiously interfering with employment agreements, or both.  After deliberating approximately two and one-half hours, the jury found ECS had engaged in both practices and awarded $1.5 million in past, and $1 million in future, lost profits, and $500,000 in exemplary damages.

No. 07-50832

In ruling on ECS' post-verdict motions, the district court reduced the future lost profits to $144,260. (ECS asserts this reduced amount was based on the district court's misunderstanding of ECS' expert's damages-calculation.) Otherwise, the district court denied ECS' motions for judgment as a matter of law (requested at the close of Nova's case, at the close of all the evidence, and post-verdict), and for new trial. ECS' motion for remittitur was granted to the extent the court had already reduced future lost profits.

## II.

The Seventh Amendment preserves the right of trial by jury for civil actions. U.S. CONST. amend. VII. For the unfair-competition verdict at hand, this appeal, concerning expert witness expertise, conflicting evidence, and two proposed jury instructions, is a classic example why trial must take place in district court, not here. The below-discussed standards of review for the issues presented amply demonstrate this.

It is undisputed that Texas law applies in this diversity action. ECS asserts: Nova's expert witness' testimony was inadmissible; judgment as a matter of law should have been granted for ECS because there was not sufficient evidence for the jury to find either liability or damages; and the district court erred by refusing two ECS-proposed jury instructions. Again, Nova does *not* appeal the district court's reducing the future-lost-profits award.

## A.

Judgment as a matter of law is proper when "a party has been fully heard on an issue during a jury trial and the court finds that a *reasonable jury* would *not* have a legally sufficient evidentiary basis to find for the party on that issue . . . ." FED. R. CIV. P. 50(a) (emphasis added); *see also* FED. R. CIV. P. 50(b) (post-trial motion for judgment as a matter of law). In deciding whether judgment as a matter of law should have been granted, an appellate court must first excise inadmissible evidence; such evidence "contributes nothing to a legally sufficient

4

No. 07-50832

evidentiary basis". *Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2000) (internal quotation marks omitted). Therefore, addressed first is the contested admission of Nova's expert witness' testimony on damages. *See Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 193 (5th Cir. 2006).

The Federal Rules of Evidence require the district court to act as "gatekeeper", to ensure expert testimony is relevant and reliable. FED. R. EVID. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-95 & n.7 (1993). "The focus, of course, must be solely on principles and methodology, *not* on the conclusions that they generate." *Daubert*, 509 U.S. at 595 (emphasis added).

The admissibility of expert testimony is reviewed for abuse of discretion. *E.g.*, *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). In that regard, the admissibility ruling is not reversed unless it is "manifestly erroneous". *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

In contending the district court abused its discretion by admitting the expert's (Malek's) testimony, ECS challenges his expertise and the reliability of his opinions. ECS maintains: Malek "was not qualified to render opinions regarding the inner-workings of an environmental consulting business"; and, "his methodology was fundamentally flawed and lacked the reliability required under the exacting standards of *Daubert*". For the reasons that follow, there was no abuse of discretion, especially in the light of the untimeliness of ECS' pre-trial motion to exclude his testimony.

ECS waited until 25 September 2006, only six days before trial, to first move to exclude the testimony by Malek—Nova's only expert witness on damages. As it does now, it contended: Malek was unqualified to render opinions regarding the inner-workings and resiliency of an environmental consulting firm; and his methodology was flawed because it failed to take into account the loss of "mold work" in San Antonio, relied on a budget whose achievability Malek did not analyze or investigate, assumed Nova's San Antonio

5

No. 07-50832

office was "destroyed", disregarded the nature of the employment agreements at issue, and used terminal values.  ECS' counsel "ple[d] for mercy" to excuse the untimeliness of the motion, asserting that they had not become lead counsel until 31 January 2006, after the scheduling order was entered, and had inadvertently missed the deadline; they urged Nova would suffer no prejudice.

At a pre-trial conference on 29 September, ECS' motion was discussed and denied as untimely.  As a result of the discussion, the district court had ample opportunity to consider ECS' objections. (As reflected below, after denying ECS' motion, the district court entertained ECS' repeated *Daubert* challenges.  In that regard, Nova's counsel conceded at the pre-trial conference that ECS could renew its *Daubert* challenge at a later date if it had grounds, despite ECS' motion's being denied that day as untimely.)

On 5 October 2006, during ECS' *voir dire* of Malek at trial, a *Daubert* hearing was held.  Malek's testimony was ruled admissible.  In doing so, the district court stated:  "[W]e have invested this much time, and we will proceed to a jury verdict, unless [Nova] decide[s] that the Supreme Court and the Fifth Circuit ha[ve] made it untenable to go forward".

Subsequently, when Nova tendered Malek at trial as an expert witness on economic harm and computation of economic damages, ECS' objections were renewed and overruled.  After Malek's testimony, ECS reurged its *Daubert* motion, contending: "There is absolutely no evidence tying any alleged wrongful conduct [to the damages]".  The motion was again denied.

1.

Regarding Malek's qualifications, ECS contends he should not have been allowed to testify regarding Nova's ability to recover from a particular market shift (the decline of "mold work"), because he is a "financial consultant and certified public accountant who has no experience in the environmental consulting field".  On the other hand, during the *voir dire* of Malek at trial, he

No. 07-50832

testified, *inter alia*, that he is also a "certified insolvency and restructuring advisor", who "works with businesses that are failing", and has "consulted with [an engineering consulting firm] for methodologies of revitalizing its business after it came out of bankruptcy". Accordingly, it was not an abuse of discretion ("manifestly erroneous") to rule Malek was qualified to testify on this subject. *See Trugreen Cos. v. Scotts Lawn Serv.*, 508 F. Supp. 2d 937, 958-59 (D. Utah 2007) (ruling insolvency and reorganization advisor qualified).

2.

As noted, Nova's employees left to join ECS from February through April 2002. Regarding the reliability of Malek's testimony, ECS challenges several assumptions it contends were underlying his calculation of profit loss caused by ECS: that Nova would have adapted to San Antonio's loss of environmental consulting work involving testing for mold, achieved its 2002 budget, and remained operational with its pre-April-2002 employees for perpetuity; and that all of Nova's lost profits were attributable to ECS' unfair competition, which Malek did not specifically identify. Those assumptions, however, were fully explored at trial.

Malek opined that the 2002 budget was achievable, and testified to the basis of that belief, including that it was prepared by McIntosh (who also testified to its achievability), a few months before he joined ECS in April 2002. (It was approved on 17 January 2002.)   Malek recognized the declining availability of consulting work related to mold, and opined that it would not have affected Nova's budget because of Nova's ability to adapt. (The nature, extent, and effect of the decline in "mold work" was a contested issue, on which both parties presented conflicting accounts.)   Malek testified he knew Nova's employees were at-will employees; took into account the possibility they would resign to join other entities; did not identify specific acts of misconduct or

7

No. 07-50832

differentiate between legal or illegal conduct; and projected discounted damages for hundreds of years into the future.

ECS, however, cites nothing to show any of those assumptions render an expert's opinion unreliable in these circumstances. Moreover, "[w]hen, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony". *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) (citations omitted). Rather, "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence'". *Pipitone*, 288 F.3d at 250 (quoting *Daubert*, 509 U.S. at 596).

There was vigorous cross-examination of Malek, as discussed *infra*, as well as the presentation of contrary evidence. Further, although ECS' expert used a different approach, he agreed with much of Malek's underlying methodology. In addition, the following limiting instruction was given: "[T]he court accepts [the competing experts on damages] at a *threshold level* . . . . But ultimately, then you all as the judges of the facts still make the determination of whether you want to believe any, all[,] or none of [their] testimony". (Emphasis added.)

Therefore, the decision to permit Nova's expert, Malek, to testify was not "manifestly erroneous". Accordingly, the district court did not abuse its discretion by admitting that testimony.

### B.

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). ECS contends the evidence was insufficient to support the verdict for misappropriation of trade secrets, for tortious interference with Nova's employment agreements, and for actual and exemplary damages.

No. 07-50832

This court reviews *de novo* the district court's ruling on a motion for judgment as a matter of law, applying the same standard as did the district court. *E.g. Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 235 (5th Cir. 2001). "We consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." *Brown v. Bryan County, OK*, 219 F.3d 450, 456 (5th Cir. 2000) (citation omitted). This is because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge". *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Before us is only the cold record.

Therefore, as quoted earlier, the judgment must be upheld unless "a reasonable jury would not have a legally sufficient evidentiary basis to find" as the jury found. FED. R. CIV. P. 50(a)(1); *see Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 282 (5th Cir. 2007). Accordingly, although our review is *de novo*, this standard of review with respect to a jury verdict is especially deferential. *E.g.*, *Brown*, 219 F.3d at 456-57 (citing *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998)). "As such, judgment as a matter of law should not be granted unless the facts and inferences point so strongly and overwhelmingly in [ECS'] favor that reasonable jurors could not reach a contrary conclusion." *Navigant*, 508 F.3d at 282 (citation and internal quotation marks omitted).

Nova's claims concern unfair competition, "the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters". *United Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App.—Waco 1993, writ denied) (quoting *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)). Again, Nova's underlying

No. 07-50832

tort claims were for misappropriation of trade secrets and tortious interference with its employment agreements.

1.

ECS claims the evidence was insufficient to hold it liable for misappropriating Nova's trade secrets. "Under Texas law, there are three elements needed to establish the injury of trade secret misappropriation: (1) a trade secret exists; (2) [ECS] acquired the trade secret by breach of a confidential relationship or other improper means; and (3) [ECS] used the trade secret without authorization." *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 449 (5th Cir. 2007) (citation and internal quotation marks omitted). ECS contends Nova failed to adduce competent evidence to support any of those elements. Each is considered in turn.

a.

Under Texas law, "[a] trade secret is any . . . compilation of information used in one's business, and which gives an opportunity to obtain an advantage over competitors who do not know or use it". *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991) (citation omitted); *see also Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). Among other examples of trade secrets, Texas courts have provided the following: customer lists, client information, customer preferences, and buyer contacts. *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 601 (Tex. App.—Amarillo 1995, no writ); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd).

Texas courts consider six factors when evaluating whether a trade secret exists. *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 267 (5th Cir. 2007); *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). Those factors are:

10

No. 07-50832

(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of the measures taken . . . to guard the secrecy of the information; (4) the value of the information to [the person claiming the trade secret] and to his competitors; (5) the amount of effort or money expended by [the person claiming the trade secret] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Triple Tee Golf*, 485 F.3d at 267; *see also In re Bass*, 113 S.W.3d at 740.

On the other hand, Texas law does not require a "party claiming a trade secret . . . to satisfy all six factors because trade secrets do not fit neatly into each factor every time". *In re Bass*, 113 S.W.3d at 740. There may be other circumstances relevant to the trade-secret analysis; therefore, Texas courts "weigh the [six] factors in the context of the surrounding circumstances to determine whether" a trade secret exists. *Id.* (As discussed *infra* in part II.C., ECS maintains the district court reversibly erred by refusing ECS' proposed instruction that incorporated this six-factor test.)

Nova presented evidence that its client information was confidential and a trade secret. Nova President Cummings testified that client recruitment, and hence the protection of client information, is critical to an environmental consulting firm; this takes an enormous amount of time and resources. Cummings explained that, while developing clients, Nova inputs confidential client information into its client-contact database, called Telemagic. This client information includes names, locations, cell-phone and work-telephone numbers, and other important information obtained about clients from interactions with them. Cummings testified that this information, which, again, is entered by Nova employees into Telemagic, is considered confidential, trade secret, and proprietary. He also explained that Nova employees are aware this information is considered a trade secret.

11

No. 07-50832

Consistent with Cummings' testimony, ECS employee, and former Nova manager, McIntosh testified that confidential client information developed by Nova employees was recorded in Telemagic, and that steps were taken by Nova and its employees to protect that information.  McIntosh explained that the types of information he recorded in Telemagic included:  names; addresses; cell-phone, work-telephone, and fax numbers; email addresses; and other key information to be used to contact customers and satisfy their particular preferences.

b.

For the second element for trade-secret misappropriation, ECS must have acquired a Nova trade secret by breach of a confidential relationship or other improper means.  "One is liable for disclosure of trade secrets if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in one who is in a confidential relationship with another who discloses protected information to him."  *Phillips v. Frey*, 20 F.3d 623, 630 (5th Cir. 1994) (citations omitted).

The four former Nova managers who left Nova to work for ECS (McIntosh, Burge, Hernandez, and Hunter) signed employment agreements in which they agreed not to disclose confidential information.  These agreements defined confidential information as proprietary or trade-secret information, such as information relating to present and prospective customers.

ECS Vice President Harwood admitted that, when he opened the ECS office in San Antonio, he had nothing but a notebook, checkbook, cell phone, and the ECS goal of becoming the dominant environmental consulting firm in the city.  Harwood confirmed that, to dominate the market, he needed to rapidly grow the ECS office and increase revenue; and that, to achieve this, he needed to recruit top-grade professional employees who could bring in client information, do the work, and produce revenue.  Harwood also confirmed the

12

No. 07-50832

ECS strategy for entering the market was to take top talent from other firms, which it did by hiring out of Nova's San Antonio office its top managers, project managers, and key technicians. It was stipulated that all four former Nova managers (individual defendants until voluntarily dismissed during trial) resigned during February and April 2002; and three of them (McIntosh, Hernandez, and Hunter) were solicited by ECS on 2 April before resigning from Nova on 8 April.

Brett Gitskin, ECS Illinois President and a member of the ECS board of directors, admitted he knew the former Nova managers had agreed in employment agreements *not* to disclose Nova's confidential information. This notwithstanding, ECS' Harwood admitted that every former Nova employee hired by ECS was expected immediately to begin entering all of their contact information into the ECS contact database. Gitskin confirmed ECS failed to instruct the former Nova managers that ECS did not want Nova's client-contact information.

Burge, a former Nova manager, was hired away by ECS on 4 February 2002. When Nova became aware Burge was contacting his former Nova clients on behalf of ECS, using client-contact information generated at Nova, Nova lawyers sent a letter to Burge, to which was attached a copy of his Nova employment agreement. A copy of that letter was also sent to ECS President Lucas. This letter reminded Burge, and ECS, his new employer, that the Nova employment agreement prohibited former Nova employees from using, or disclosing, any of Nova's confidential information and prohibited former Nova employees, for a period of one year after leaving Nova, from soliciting Nova employees for hire by ECS. ECS' president and the firm's general counsel reviewed the letter and the employment agreement and instructed ECS supervisors in San Antonio that the Nova employment agreement was not enforceable and they need not worry about it.

13

No. 07-50832

c.

For the third, and final, element for trade-secret misappropriation, ECS must have used a Nova trade secret without authorization. "As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use'. . . . [Therefore] soliciting customers through the use of information that is a trade secret . . . constitute[s] 'use.'" *Gen. Universal Sys., Inc.*, 500 F.3d at 451 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40).

Burge admitted that he took a business-card collection from Nova when he moved to ECS. Burge confirmed those business cards contained handwritten notes with further details gathered about clients through dealings with them, such as names of contact persons, cell-phone numbers, and other notes. Burge loaded into ECS' database the contact details of several clients with whom he had worked while he was employed at Nova. After moving to ECS, and using such Nova client-contact information, Burge contacted these Nova clients on behalf of ECS and generated work from them.

McIntosh, one of the Nova managers hired away by ECS in April 2002, also admitted he took a business-card collection from Nova when he moved to ECS. McIntosh admitted he had used Nova customer-contact information to develop business for ECS. ECS Illinois President Gitskin confirmed that McIntosh used this contact information and his relationship with Farmers Insurance to increase ECS revenues significantly. Along this same line, the jury heard testimony by Steve Tyson, a corporate recruiter in San Antonio who had established a relationship with McIntosh while he was with Nova. Tyson testified that, after McIntosh left Nova for ECS, he informed Tyson that he had Nova clients, and that he would have taken the copier machine and the vehicle if he could have gotten away with it.

No. 07-50832

In sum, in the light of the foregoing evidence, there was sufficient evidence for a reasonable jury to conclude ECS misappropriated Nova's trade secrets. A reasonable jury could have found that the information Nova employees loaded into Telemagic—items such as names, locations, cell-phone and work-telephone numbers, and other important information obtained about the client—was trade secret, confidential, and proprietary. Contrary to ECS' contentions, the jury was not obligated to focus on whether the Telemagic software or printouts from the system were misappropriated. A reasonable jury could consider evidence which demonstrated that the information loaded into Telemagic was the true trade secret, rather than the database which served as a repository of that information.

There was also sufficient evidence for a reasonable jury to find that ECS acquired the trade-secret client-contact information through breach by its former Nova employees of their Nova employment agreements. The evidence showed ECS was aware of the employment agreements; yet, in contravention of them, continued to require former Nova managers to load their client information into the ECS database.

A reasonable jury could also find that, after acquiring Nova's trade-secret information by hiring former Nova managers and requiring them to load the protected information into the ECS database, ECS, without authorization, then used that information to its advantage and Nova's detriment. The evidence supported a reasonable jury's finding that ECS used Nova trade-secret client information to gain new customers and to increase revenues.

2.

ECS also maintains the evidence was insufficient to hold it liable for tortious interference with Nova's employment agreements. Our having held there was sufficient evidence for a reasonable jury to find ECS misappropriated Nova's trade secrets, it is not necessary, for liability purposes, to address this

15

No. 07-50832

claim. It is addressed, however, because the jury's finding both torts were committed may have been a factor in its actual and exemplary damages awards.

Under Texas law, the elements of a tortious-interference-with-contract claim are: "(1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of damage; and (4) actual damage or loss occurred". *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 864 (5th Cir. 2004) (citation omitted); *see also Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996).

ECS contends that, for Nova to prevail on this claim, Nova was required to show ECS caused one of the former Nova managers (who were all party to the Nova employment agreements, discussed *supra*) to either breach the confidentiality provision of the employment agreement or to solicit Nova employees for employment at ECS. ECS confines its challenge on this claim, however, to ECS' solicitation of Nova employees, apparently relying on its earlier-addressed contention that there was no misappropriation of Nova's trade secrets. In other words, ECS does not again address the sufficiency of the evidence on ECS' interfering with the confidentiality provision of the Nova employment agreements.

To find ECS tortiously interfered with contractual relations, the jury could have found either that ECS tortiously interfered with the confidentiality provisions, or that ECS tortiously interfered with the contractual prohibitions on solicitation by former Nova employees of current Nova employees for employment at ECS. The jury was not required to find both. Therefore, we need address only ECS' tortious interference with the confidentiality provisions of the Nova employment agreements; this one matter provided sufficient basis for a reasonable jury's finding such interference.

16

No. 07-50832

a.

As noted, the first element for the tortious-interference-with-contractual-relations claim is that there must be a contract subject to interference. The Nova employment agreements were in evidence. As discussed, *supra*, with regard to Nova's misappropriation-of-trade-secrets claim, evidence was presented about Nova employment agreements signed by former Nova managers who were later hired away to work for ECS. By signing the employment agreements, the Nova managers agreed, *inter alia*, *not* to disclose or use Nova's confidential information, except as required by their duties to Nova. ECS does not appear to challenge the Nova employment agreement's being a contract subject to interference.

b.

To satisfy the willful-and-intentional-act-of-interference element of this tortious-interference claim, Nova was not required to prove ECS acted with intent to injure. *Fluorine On Call*, 380 F.3d at 864. Nova, however, was required to prove ECS acted with intent to interfere with the contract. *Id.*

As discussed, *supra*, with regard to the second element of Nova's misappropriation-of-trade-secrets claim, the jury received evidence from which a reasonable jury could find ECS willfully and intentionally interfered with Nova employment agreements. Along this line, as also discussed, *supra*, ECS' president and its general counsel reviewed the employment agreement and declared it was not enforceable and that ECS need not worry about it.

Harwood admitted that, to dominate the San Antonio market, he needed to rapidly grow the ECS office and increase revenue, which he could achieve most quickly by recruiting top-grade professional employees who could bring in client information. Harwood confirmed that, in this regard, the ECS strategy was to take top talent from other firms, which ECS did by hiring Nova's top managers, project managers, and key technicians.

17

No. 07-50832

Gitskin admitted he knew the former Nova managers were prohibited by their Nova employment agreements from disclosing Nova's confidential information. Nevertheless, as discussed *supra*, every former Nova employee hired by ECS was expected immediately to begin entering all of their contact information into the ECS contact database.

c.

Tortious-interference elements three and four are, respectively, that there must be causation and damage. As discussed *infra*, concerning the sufficiency of the evidence of actual damages, evidence was presented through which a reasonable jury could find Nova suffered damage proximately caused by ECS' tortious interference. "Preexisting profit figures, combined with evidence of relevant facts and circumstances, are sufficient to establish causation and the reasonably certain amount of damages." *Univ. Computing Co. v. Mgmt. Sci. Am., Inc.*, 810 F.2d 1395, 1398 (5th Cir. 1987) (internal quotation marks omitted). An established business' profits before the unfair competition (e.g. tortious interference), "together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost". *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098-99 (Tex. 1938). Nova's evidence of past profits and profits that would have been made absent the wrongful conduct, in the light of the facts and circumstances, is sufficient to permit a reasonable finding of causation.

Based on the foregoing evidence, there was a sufficient basis for a reasonable jury to find ECS tortiously interfered with Nova's employment agreements. A reasonable jury could have found that those agreements satisfied the first element of a claim for tortious interference—the existence of a contract subject to interference. There was also sufficient evidence for a reasonable jury to find that ECS intentionally interfered with those agreements. The evidence supports a reasonable jury's finding that ECS was aware of the agreements; yet,

18

No. 07-50832

in contravention of them, and ignoring the warning from Nova lawyers that the agreements would be enforced through legal action if necessary, continued to require former Nova managers to load their client information into the ECS database. Finally, a reasonable jury could also find from the evidence that Nova suffered damage proximately caused by ECS' tortious interference.

3.

Next, ECS contends Nova's evidence of damages, presented by its above-discussed expert, Malek, is insufficient to support the damages awarded. At issue is whether Nova adduced competent evidence from which a reasonable jury could "determine that damage was caused by the breach or interference, and to assess with reasonable certainty the amount of damage and degree of causation of the damage by the [unfair competition] relative to other factors". *Univ. Computing Co.*, 810 F.2d at 1398.

To recover lost profits under Texas law, the loss amount must be shown by competent evidence with reasonable certainty. *E.g., Sw. Battery Corp.*, 115 S.W.2d at 1098.

> Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought. Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in business which might have been expected in the light of past development and existing conditions.

*Id.* at 1098-99 (citation omitted). "The distinguishing feature between Texas cases permitting and denying recovery for lost profits is reliance upon routinely kept business records produced in court to show an evaluation of the business' decreased profitability based upon objective facts, figures[,] and data . . . ." *Holland v. Hayden*, 901 S.W.2d 763, 766 (Tex. App.—Houston [14th Dist.] 1995).

19

No. 07-50832

ECS does not dispute Nova's expert relied upon routinely kept business records produced in court, including Nova's financial statements from 1998 through 2006 and its 2002 budget, which was prepared by McIntosh only months before he left Nova to join ECS.  Nor does ECS dispute Nova's history of profitability.  Rather, ECS claims numerous "flaws" in Malek's methodology rendered his damages calculation unreliable, so that the amount of damages could not be ascertained with reasonable certainty.  (These claimed flaws are discussed *supra*:  attributing all profits lost to wrongful conduct by ECS; assuming Nova's at-will employees would remain at Nova forever; accepting Nova's 2002 budget; and using "terminal values" to calculate future profits for perpetuity.)

On the other hand, the claimed flaws potentially affecting Nova's expert's reliability were presented by ECS to the jury; and an expert's lost-profits calculation is "not required to be exact".  *Howell Crude Oil Co. v. Donna Refinery Partners*, 928 S.W.2d 100, 108 (Tex. App.—Houston [14th Dist.] 1996) (citation omitted).

Although an award is speculative and cannot be upheld "where there is no basis for determining how much of the damages suffered resulted from the wrongful acts of the defendant", *Univ. Computing Co.*, 810 F.2d at 1398, Nova's evidence of past profits and profits that would have been achieved absent the wrongful conduct, in the light of the facts and circumstances, is sufficient to permit a reasonable finding of causation.  For instance, Nova president Cummings testified:  "[W]hen the four [individual] defendants [former managers] and then subsequently the employees that they hired left, in addition to our client base, it basically devastated our office within short order".

"[A] trier of fact has the discretion to award damages within the range of the evidence presented at trial".  *Howell*, 928 S.W.2d at 108 (citation omitted). Malek opined that Nova had lost profits of $8.1 million resulting from ECS'

No. 07-50832

unfair competition.  ECS' expert countered that the most Nova could have lost
was $144,260 during the 15 months following ECS' conduct beginning in early
2002, or a total of $263,000 over the ten years following that conduct.  In the
light of Nova's expert's calculations, a reasonable jury could find a lesser amount
was more appropriate, such as that awarded by the jury: $1.5 million for past,
and $1 million for future, profits.  *See id.* (upholding award within the range of
evidence).

Similarly, a reasonable fact-finder could also conclude the district court's
award of $1.5 million for past, and $144,260 for future, profits was appropriate.
Again, Nova does not appeal the district court's future-profits reduction.  As
testimony showed, because the Nova at-will employees could have resigned from
Nova at any time, which could have affected Nova's profitability, a reasonable
fact-finder could have found $144,260 more appropriate for future lost profits.

ECS also contends Nova's counsel's recalculating damages, differently
than his expert, Malek, during closing argument shows Malek's calculation was
not made with the requisite certainty.  The record reflects, however, that ECS
did not object to this argument, and Nova's counsel's statement was merely an
alternative argument that Nova was entitled to "a minimum" of $2,266,269 for
past lost profits, and an equal amount for future lost profits.

Accordingly, a reasonable jury could find with reasonable certainty that,
due to ECS' conduct, Nova suffered the awarded amount of lost-profits.
Therefore, judgment as a matter of law regarding actual damages was properly
denied.

21

No. 07-50832

4.

As it does with actual damages, ECS contends there was insufficient evidence to support the exemplary-damages of $500,000. (We need not address ECS' contending they are unwarranted because the evidence was insufficient for a reasonable jury to find a tort or damages, our having ruled sufficient evidence existed on those points.)

Exemplary damages may be awarded if clear and convincing evidence shows Nova's harm was caused by ECS' malice, *i.e.*, "specific intent by [ECS] to cause substantial injury or harm to [Nova]". TEX. CIV. PRAC. & REM. CODE §§ 41.001, 41.003; *Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co.*, 223 S.W.3d 1, 22 (Tex. App.—El Paso 2005). Specific intent means the defendant "desires to cause the consequences of his act, or he believes the consequences are substantially certain to result from it"; and it may be proven by circumstantial evidence. *Marrs & Smith*, 223 S.W.3d at 22. At issue, then, is whether there is substantial evidence from which a reasonable jury could have found, by clear and convincing evidence, that ECS, through its use of Nova's confidential information and tortious interference, desired to substantially injure or harm Nova, including for Nova to lose profits, or believed that was substantially certain to result.

Clear and convincing evidence of ECS' intent to cause specific harm to Nova could have been found by a reasonable jury from the evidence concerning ECS' knowing decisions to:  (1) "conquer and dominate" the market; (2) deprive Nova of its key employees; (3) intentionally ignore the contractual obligations of the former Nova employees *not* to disclose Nova's confidential information; and (4) compel the former Nova employees to "immediately" input their confidential Nova client contact information in ECS' database and begin using it for ECS.

The above-described testimony of a recruiter's conversation with an ECS employee, McIntosh, provides further evidence a reasonable jury could consider;

22

No. 07-50832

it reflected his joking about leaving Nova and saying he "got the clients and he would have taken the copier machine and the vehicle if he could have gotten away with it". There was also evidence that future-ECS-employees sought and did business for ECS with Nova clients while still employed by Nova.  In addition, vulgarity about a Nova officer in an email between a former Nova manager who joined ECS and the ECS president was evidence a reasonable jury could consider regarding malice. Accordingly, there was substantial, competent evidence from which a reasonable jury could have found clear and convincing evidence of ECS' malice.

In sum, the jury found that ECS misappropriated Nova's trade secrets and tortiously interfered with its employment agreements, resulting in actual and exemplary damages.  Regarding ECS' seeking judgment as a matter of law on liability and damages, and considering the evidence in the requisite light most favorable to Nova, with all reasonable inferences made in its favor, the facts and inferences do *not* point so strongly and overwhelmingly in favor of ECS that reasonable jurors could not arrive at a contrary verdict.

## C.

Consistent with its objections at trial, ECS maintains the district court failed to properly instruct the jury on two points:  (1) how to determine whether information is a trade secret under Texas law; and (2) the parameters of lawful competition. The district court refused ECS' proposed instruction in that regard. Abuse of discretion is the standard for reviewing jury instructions objected to at trial. *E.g.*, *Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 550 (5th Cir. 2005).

"A district court does not abuse its discretion if its instructions, as a whole, state the law correctly and instruct the jury properly on the legal principles to be applied to the facts that they will decide." *Id*. Three requirements must be met in order to successfully challenge a jury instruction:

23

No. 07-50832

First, the challenger must demonstrate that the charge as a whole
creates "substantial and ineradicable doubt whether the jury has
been properly guided in its deliberations." Second, even if the jury
instructions were erroneous, we will not reverse if we determine,
based upon the entire record, that the challenged instruction could
not have affected the outcome of the case. Third, the appellant must
show that any proposed instruction it contends should have been
given was offered to the district court and correctly stated the law.

*Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 290-91 (5th Cir. 2005) (citations
omitted).

1.

ECS contends the earlier-discussed six-factor trade-secret test from *In re
Bass*, 113 S.W.3d at 740, should have been included in the instructions. Texas
courts "weigh the [six] factors in the context of the surrounding circumstances
to determine whether" a trade secret exists. *Id.* As noted, and contrary to ECS'
contention, this six-factor test was crafted as a tool to be used by courts to
evaluate whether evidence supports the existence of a trade secret. *Id.*
(explaining the factors are relevant, not dispositive, because it is not possible to
state the precise criteria for determining the existence of a trade secret).

ECS cites no authority holding juries must be instructed on the test.
Furthermore, the instructions provided Texas substantive law on trade secrets,
including what constitutes such a secret, and properly guided the jury in its
deliberations on this point.

2.

ECS also contends the jury should have been instructed on the parameters
of lawful competition. To this end, ECS proposed an instruction with language
derived from *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904-05 (Tex. App.–Dallas
1989, writ denied) (explaining it is not unfair competition to appropriate all the
customers a firm can obtain—even if this drives the competition out of

24

No. 07-50832

business—so long as the means used does not violate the law or the competitors' legal rights).

As previously stated, to successfully challenge a jury instruction, the challenger must first show the jury instructions, as a whole, create "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations". *Int'l Ins. Co.*, 426 F.3d at 290. ECS attempts to satisfy this requirement by claiming its proposed instruction was necessary to guide the jury on the vague tort of unfair competition. The district court instructed the jury, however, that it was allowed to find unfair competition only if it found ECS had engaged in either misappropriation of trade secrets, tortious interference, or both. The district court instructed the jury on the substantive law of both torts. Pursuant to the submission of the claims in that manner, the jury was properly guided in its deliberations.

In sum, for these two points, the district court did not abuse its discretion by declining to instruct the jury in the manner requested by ECS.

### III.

For the foregoing reasons, the judgment is AFFIRMED.

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

U. S. COURT OF APPEALS

**FILED**

SEP 0 8 2008

CHARLES R. FULBRUGE III
CLERK

## BILL OF COSTS

NOTE: The Bill of Costs is due in this office *within 14 days from the date of the opinion, See* FED. R. APP. P. & 5TH CIR. R.39. Untimely bills of costs must be accompanied by a separate motion to file out of time, which the court may deny.

Nova Consulting Group, Inc.    v. Engineering Consulting Services, Ltd. No. 07-50832

The Clerk is requested to tax the following costs against: Engineering Consulting Services, Ltd.

| COSTS TAXABLE UNDER Fed. R. App. P. & 5th Cir. R. 39 | REQUESTED | | | | ALLOWED (If different from amount requested) | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Copies | Pages Per Copy | Cost per Page* | Total Cost | No. of Documents | Pages per Document | Cost per Page* | Total Cost |
| Docket Fee ($450.00) | | | | | | | | |
| Appendix or Record Excepts | 10 | 43 | .15 | 64.50 | 10 | 43 | .15 | 64.50 |
| Appellant's Brief | | | | | | | | |
| Appellee's Brief | 15 | 73 | .15 | 164.25 | 15 | 72 | .15 | 162.00 |
| Appellant's Reply Brief | | | | | | | | |
| Other: | | | | | | | | |
| | | | Total $ | 228.75 | | | | 226.50 |

Costs are hereby taxed in the amount of $ 226.50 this ____ 15th

Costs are taxed in the amount of $ 226.50

State of _____ TEXAS

County of _____ HARRIS

day of September, 2008

CHARLES R. FULBRUGE III, CLERK

By _____
Deputy Clerk

I William Thomas Womble _____, do hereby swear under penalty of perjury that the services for which fees have been charged were incurred in this action and that the services for which fees have been charged were actually and necessarily performed. A copy of this Bill of Costs was this day mailed to opposing counsel, with postage fully prepaid thereon. This 3rd day of September , 2008

William Thomas Womble
(Signature)

Attorney for Nova Consulting Group, Inc.

*SEE REVERSE SIDE FOR RULES
GOVERNING TAXATION OF COSTS

U.S. COURT OF APPEALS
RECEIVED
SEP 0 8 2008
NEW ORLEANS, LA